Cite as 2021 Ark. App. 144

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CR–20–141

| | |
|---|---|
| | **Opinion Delivered:** March 31, 2021 |
| LAZARO VENEROS-FIGUEROA <br> APPELLANT | APPEAL FROM THE SEVIER COUNTY CIRCUIT COURT [NO. 67CR–15–38] |
| V. | |
| | HONORABLE CHARLES A. YEARGAN, JUDGE |
| STATE OF ARKANSAS <br> APPELLEE | AFFIRMED |

## KENNETH S. HIXSON, Judge

Appellant Lazaro Veneros-Figueroa filed his pro se appeal after the Sevier County Circuit Court entered an order denying his petition for postconviction relief filed pursuant to Arkansas Rule of Criminal Procedure 37.1. Appellant argues on appeal that the circuit court erred in denying his petition for postconviction relief because (1) his trial counsel was ineffective in failing to challenge L.S.'s competency; (2) his trial counsel was ineffective in presenting damaging testimony; (3) his trial counsel was ineffective in failing to seek out and present expert medical testimony; and (4) his trial counsel was ineffective in failing to call other lay witnesses. We affirm.[1]

---

[1] We previously ordered appellant to file a supplemental record and ordered rebriefing. *See Veneros-Figueroa v. State*, 2020 Ark. App. 392. Appellant complied with our previous order, and we have a sufficient record for our review.

## I. *Background*

Before addressing the allegations of ineffective assistance of counsel, it is necessary to recite the evidence adduced at appellant's trial. Appellant was arrested and charged with raping his stepdaughter L.S. after L.S. disclosed to her mother that appellant had repeatedly subjected her to anal intercourse. At trial, L.S. testified that she was fourteen years old and that she understood that she swore to tell the truth. She explained that she knew that if she lied, she would be in trouble. She described in detail the incidents in which appellant had raped her and explained that appellant had begun by inappropriately touching her when she was eight years old. She explained that the first incident occurred inside a chicken house. At that time, appellant worked on a chicken farm, and she would help on the farm. L.S. testified that appellant continued to touch her under her clothes even after she told him to stop. While the incidents began with appellant inappropriately touching her, they continued to get worse and later involved anal intercourse. She stated that the incidents happened in the control rooms in the chicken houses on the farm and also in the family home. L.S. remembered that appellant would use blue paper towels to clean up after he had finished raping her when they were at the farm. Appellant stopped about three weeks before L.S. told her mother about the incidents on Ash Wednesday in 2015. L.S. stated that she was thirteen years old at that time. On cross-examination, L.S. testified that she had been having nightmares and that she had seen defense counsel in one of her nightmares,

2

despite the fact that she had not met defense counsel prior to trial. She also admitted on cross-examination that she believed that she had previously seen a "spirit" friend who died.

Deputy Brian Hankins testified that he spoke with L.S. during his investigation and that L.S. told him that the incidents took place over several years. He took pictures and video of the chicken houses where L.S. told him some of the incidents happened. State trooper Ernesto Echevarria testified that he was called out to provide translating services on February 22, 2015, when the investigation began. Trooper Echevarria interviewed appellant after he had read appellant his *Miranda* rights. Appellant denied the allegations, but he admitted that L.S. helped him in the chicken houses and that the last time she helped was three weeks prior to February 22.

Odia Russette, a registered nurse employed by the Children's Advocacy Center of Texarkana (Advocacy Center), testified that she interviewed and examined L.S. L.S. told her about the incidents, and during a physical exam, Nurse Russette observed anal scarring consistent with L.S.'s allegations. Nurse Russette testified that L.S. did not report that she had any constipation or problems using the restroom at that time. However, Nurse Russette testified that she did not think constipation would cause the scarring she observed and instead opined that it was the result of an injury.

Appellant moved for a directed verdict at the close of the State's case, alleging that there were some "credibility issues" with L.S. because she had given "different stories" about the incidents. The trial court denied the motion.

Defense counsel first called Melanie Halbrook, the forensic interviewer at the Advocacy Center. Ms. Halbrook testified that she had interviewed L.S. on March 9, 2015.

She further testified that L.S. had disclosed to her that the sexual abuse occurred in the chicken house and in the bathroom in her home from the time she was eight years old until she was thirteen years old. Ms. Halbrook described the details of the incidents that L.S. told her, which corroborated L.S.'s earlier testimony. Ms. Halbrook testified that she was not concerned with L.S.'s credibility simply because L.S. had delayed disclosing the details to her mother until several years after the sexual abuse started. Ms. Halbrook stated that delayed disclosure is very common, especially when a family member is involved. She also explained that grooming is when a sex offender is able to create a bond with the victim, sexualize that relationship, and keep it a secret. She testified that she saw signs of grooming in this case.

L.S.'s mother, Lorenza Sostenes, also testified in appellant's presentation of evidence. She testified that her daughter had constipation issues in the past that required her to give her enemas. Appellant's counsel asked Ms. Sostenes if she knew about L.S.'s "imaginary friend" or "spirit." Ms. Sostenes admitted that L.S. had told her "that there was a man that will talk through the [stuffed toy] owl and that one night he told [her] to start a fire in her room." On another occasion, L.S. told her that a girl at school had touched her inappropriately in a school bathroom when she was six years old. Ms. Sostenes testified that she made the report to the hotline after L.S. had disclosed appellant's abuse to her on Ash Wednesday. She further indicated that L.S. does not lie to her and that L.S. described the incidents with appellant to her in detail. Ms. Sostenes finally testified that she believed her daughter more than appellant because L.S. had nothing to gain by making the allegations.

Appellant testified on his own behalf and denied the allegations. Appellant moved for a directed verdict again after all the evidence was presented, and the trial court denied the motion. The jury convicted appellant, and appellant was sentenced to serve 360 months' imprisonment. After appellant's conviction, he appealed, arguing that the trial court erred by allowing L.S. to testify when she was not competent. We affirmed, holding that we were precluded from addressing whether L.S. was competent because appellant failed to challenge L.S.'s competency as a witness at trial. *Veneros-Figueroa v. State*, 2017 Ark. App. 94, 512 S.W.3d 692.

## II. *Petition for Postconviction Relief and Rule 37 Hearing*

Following our affirmance, appellant filed his petition for postconviction relief, through new counsel, alleging that he was entitled to relief because his trial counsel was ineffective by trial counsel's (1) failure to challenge L.S.'s competency as a witness and move to exclude her testimony on the basis of her incompetency to testify; (2) decision to present highly damaging testimony by two witnesses in appellant's case-in-chief; (3) failure to seek out and present expert medical testimony to rebut the damaging testimony presented by Nurse Russette; and (4) failure to call other lay witnesses. An evidentiary hearing on appellant's petition was held on September 19, 2019, and appellant was represented by attorney Craig Lambert at the hearing.

At the hearing, Dr. Jay Douglas Holland testified on behalf of appellant. Holland is a family-practice doctor in Little Rock, Arkansas, and explained that he has experience in treating people with anal injuries; however, he had not had any specialized training regarding sexual assault. Dr. Holland testified that he had read the medical records and trial

5

transcripts and opined that if appellant had been anally raping L.S. since she was eight years old, he would have expected there to be blood in L.S.'s underwear or that L.S. would have had problems with her bowels, necessitating a physician's assistance. Because L.S. testified that neither lubricant nor a condom was used, Dr. Holland further opined that he did not "see how that could happen without some more significant trauma[.]" Dr. Holland additionally questioned the plausibility of the positioning L.S. described during her testimony. He explained that L.S. would have trouble balancing if appellant anally penetrated her with her bending over and grabbing her ankles. He also expected a lot of trauma to occur if that position was used. Dr. Holland was also critical of Nurse Russette's[2] physical-examination findings and testimony. Contrary to Nurse Russette's trial testimony, Dr. Holland testified that he thought the scarring could have been very old and could have been caused by a history of constipation. In light of L.S.'s testimony regarding an imaginary friend or spirit, Dr. Holland thought L.S. needed more extensive evaluation and therapy. Although he admitted that he did not know what was going on with L.S., he thought "there is a real possibility in her age group to exaggerate any story she tells." On cross-examination, however, Dr. Holland admitted that Nurse Russette testified that the scarring was consistent with L.S.'s testimony and not that the scarring conclusively meant appellant had raped her. Dr. Holland further admitted that he did not know the size of appellant's penis, and he agreed that if appellant has a small penis, he may not have caused L.S. any damage.

---

[2]We note that Dr. Holland erroneously referred to Nurse Russette as Nurse Brewset during his testimony.

6

Leo Monterrey, appellant's trial counsel, testified that he could not find any witnesses who were willing to cooperate and testify on appellant's behalf. Mr. Monterrey testified that he would have attempted to contact any witnesses whose names he was given. He testified that he did not raise the issue of L.S.'s competency because "there was nothing that led [him] to believe that she was going to be incompetent to testify . . . and [he] didn't want to file a frivolous motion[.]" However, Mr. Monterrey testified that after finding L.S.'s testimony bizarre, he "hammered" her lack of credibility in his closing argument. Mr. Monterrey further testified that he did not want to challenge L.S.'s competency because he feared that other damaging statements would be admitted through third parties if she was declared as an unavailable witness. His trial strategy was to let the jury hear L.S.'s "craziness."

Regarding his decision to call Ms. Halbrook as a witness on behalf of the defense, Mr. Monterrey testified that he called her to attack L.S.'s credibility. He intended to point out the inconsistencies between L.S.'s testimony and what L.S. had told Ms. Halbrook. Mr. Monterrey admitted in hindsight that Ms. Halbrook's testimony ultimately hurt more than helped the defense. In anticipation of trial, Mr. Monterrey spoke to Ms. Sostenes, and at that time, Ms. Sostenes told him that she believed appellant and thought L.S. was lying. Based on those conversations, Mr. Monterrey had called Ms. Sostenes as a witness. However, Ms. Sostenes changed her story on the stand and instead corroborated L.S.'s testimony. Mr. Monterrey thought Ms. Sostenes did provide some helpful testimony about L.S.'s constipation issues and that appellant has a small penis despite L.S.'s testimony that it was "big." In hindsight, Mr. Monterrey testified that he wished he could have found a

7

doctor, similar to Dr. Holland, to corroborate that constipation issues could have caused the scarring instead of relying on Ms. Sostenes's testimony. However, Mr. Monterrey opined that even if Dr. Holland had testified, it would not have changed the outcome with the jury that was impaneled.

Finally, regarding appellant's allegations that trial counsel should have called Thong Le (also referred to by the name Tom Lee at the hearing), appellant's boss, and Jason Hooper, Mr. Monterrey testified that he spoke with Mr. Le prior to trial; however, Mr. Le did not want to testify or have anything to do with the case. Although Mr. Monterrey acknowledged that he could have subpoenaed Mr. Le to compel his testimony, Mr. Monterrey testified that his philosophy was that "if you don't want to volunteer to come, you are not going to be helpful to us . . . [a]s a character witness[.]" When pressed if Mr. Le and Mr. Hooper could have been called not just as character witnesses but to also testify that the control rooms on the chicken farm lack privacy, Mr. Monterrey responded that appellant never told him anything about that being the case. That issue was never discussed or brought to his attention. Mr. Monterrey did not remember appellant's ever providing him Mr. Hooper's name as a potential witness.

Jacob Hooper testified that he is a "farmer-rancher" and was employed by Tyson as a "field rep" from 2010 until 2014. During his employment, he would visit the chicken farm where the incidents took place anywhere from once a week to three times a week depending on the age of the chickens. He testified that there were eleven chicken houses at the farm and all of them were very similar. He explained that the control room was a central location in each chicken house where the computers, toggle switches, breaker boxes,

8

medicators, etc., were located. Mr. Hooper testified that he did not think the control rooms were private because the service tech, the owner, a feed-truck driver, or another hired hand could randomly go in at any time. On cross-examination, Mr. Hooper testified that he saw appellant's wife and family members out on the farm. He admitted that the chicken houses were long open rooms that were "[a]nywhere from 40 to 43-foot wide to 400 to 500-foot long." Mr. Hooper further admitted that although you could see someone in the chicken house, you could not see anyone in the control room unless you went inside the control room. Finally, Mr. Hooper testified that he was never contacted by trial counsel, but he would have been willing to testify at trial if he had been asked.

Appellant was the last witness to testify at the evidentiary hearing. Appellant testified that he spoke to Mr. Monterrey prior to trial. Appellant stated that during those discussions, he told Mr. Monterrey about L.S.'s constipation issues, that they should hire a medical expert, and that Mr. Monterrey should contact Mr. Le and Mr. Hooper.

After the evidentiary hearing, the circuit court denied appellant's petition in a detailed written order filed on December 10, 2019, making the following relevant findings:

> Claim A.: Ineffective assistance based on trial counsel's failure to challenge L.S.'s competency.
>
> Petitioner asserts in his first claim for relief that trial counsel, Mr. Leonardo Monterrey (hereinafter "counsel," defense counsel," or "trial counsel") had a professional duty under *Strickland* to challenge L.S.'s competency as a witness and move to preclude her from testifying on the ground that she was incompetent. Under Arkansas law, the incompetency of a witness precludes her from testifying. *Logan v. State*, 299 Ark. 266, 773 S.W.2d 412 (1986); Ark. R. Evid. 601. To demonstrate incompetency, at least one of the following must be established: (1) the inability to understand the obligation of an oath and to comprehend the obligation imposed by it; (2) a lack of understanding of the consequences of false swearing; or (3) the inability to receive accurate impressions and to retain them. *Logan*, 299 Ark.

9

at 272, 773 S.W.2d at 416.  *See also Curtis v. State*, 301 Ark. 208, 783 S.W.2d 47 (1990).

Petitioner asserts that at least one of these three ("the inability to receive accurate impressions and to retain them") is present, and that defense counsel had a professional duty to explore the issue and move to preclude L.S.'s testimony on that basis.  At the hearing on Figueroa's Petition, trial counsel testified that he learned about L.S.'s behavior prior to trial during a discussion or interview with L.S.'s mother, Lorenza Sostenes.  Counsel also testified at the hearing that he considered the possibility of challenging L.S.'s competency but that he decided not to do so because he believed even if he successfully challenged her competency, her previous statement to law enforcement would come into evidence.

The Court finds that trial counsel's decision not to challenge L.S.'s competency was based upon trial strategy.  The Court further finds that Petitioner has failed to establish that trial counsel's performance as it relates to this issue was deficient.  Thus, it is not necessary to reach the second prong of the Strickland analysis.  However, if the Court were to consider the second prong, it would conclude that Petitioner has failed to prove that but for trial counsel's actions the results of the proceedings would have been different.  Specifically, Petitioner has not established that L.S. would have been found to be incompetent or that her testimony would have been excluded.  Additionally, even if L.S.'s testimony would have been excluded, the evidence from her testimony was presented through the testimony of other witnesses.  Finally, the jury heard the challenged testimony from L.S. and it had the ability to assess credibility based thereon.  Petitioner has failed to establish that trial counsel was ineffective for not challenging L.S.'s competency.

<u>Claim B.: Ineffective assistance for presenting damaging testimony.</u>

Petitioner's second claim for relief is based on trial counsel's decision to call two witnesses in the defense case-in-chief.  At trial, counsel called two witnesses (in addition to Figueroa) in the defense case-in-chief: (1) Melanie Halbrook (a forensic interviewer with the Texarkana Children's Advocacy Center) and Lorenza Sostenes (L.S.'s mother and Figueroa's wife).  Counsel's direct examination of Ms. Halbrook consisted of a few questions about her interview with L.S.  Halbrook explained that L.S. told her that she had been sexually abused by Figueroa.

Petitioner asserts that calling Halbrook as a witness opened the door to extensive questioning by the State in which Halbrook was allowed to present damaging, detailed testimony about the specific allegations made by L.S. in the course of her interview.  He further asserts that the questioning also opened the door to questioning by the State, and testimony by Halbrook, about "grooming" of a child by a sexual predator and about how, in Halbrook's opinion, Figueroa was doing just

that.  Petitioner argues that none of the testimony would have been heard by the jury if defense counsel had not called Halbrook as a witness.

At the Rule 37 hearing, trial counsel acknowledged that he should not have called Ms. Halbrook as a defense witness.  Trial counsel further acknowledged at the hearing that he did not interview Ms. Halbrook prior to putting her on the witness stand because she refused to speak with him.

Calling Ms. Halbrook as a witness was a matter of trial strategy.  As trial counsel acknowledged, it may not have been the best strategy, but the Court concludes that the decision did not amount to deficient performance nor were counsel's action professionally unreasonable.  Additionally, Petitioner has once again failed to establish that but for trial counsel's decision to call Ms. Halbrook as a witness the result of his trial would have been different.

Petitioner also argues that it was professionally unreasonable for defense counsel to call Lorenza Sostenes to testify.  He asserts that Sostenes's testimony did nothing but add veracity to L.S.'s story.

Trial counsel acknowledged that he made a strategic or tactical decision to call Ms. Sostenes.  Although there were portions of Ms. Sostenes's testimony that arguably did not benefit Petitioner, the Court finds that other portions of Ms. Sostenes's testimony were offered to establish reasonable doubt in the minds of the jurors.  Specifically, it was through her testimony that the jury heard about L.S.'s problems with constipation (which, arguably, would support a theory that L.S.'s anal scarring was caused by something other than sexual abuse).  On this issue, Petitioner has failed to satisfy either prong of *Strickland*.

### Claim C.: Failing to seek out and present expert medical testimony.

In his next claim, Petitioner asserts that trial counsel was ineffective for failing to seek out and present expert medical testimony to rebut the testimony presented by Odia Russette.  Nurse Russette testified that there was a certain amount of scarring around the anus of L.S. and that this scarring was "consistent" with L.S.'s version of events, i.e. that she had been anally penetrated by Figueroa.  Petitioner argues that trial counsel should have presented expert medical testimony to rebut the proof presented by the State.  Trial counsel acknowledged at the Rule 37 hearing that he never spoke with a medical expert during the course of his representation of Figueroa.

The Arkansas Supreme Court in *Abernathy v. State*, 2012 Ark. 59 explained that a petitioner alleging ineffective assistance of counsel based upon failure to present expert witness testimony is required to:  (1) name the expert witness that should have been called as a witness in the petition; (2) provide a summary of testimony that

would have been admissible into evidence; and (3) establish that such testimony would have resulted in a different outcome in the original trial.

At the hearing on his Petition, Figueroa presented testimony by Dr. Jay Holland, a family practice physician from Little Rock, who was not a trained sexual abuse examiner. Dr. Holland testified that trial counsel should have consulted with a doctor, not a nurse, that specializes in pediatric medical care. Neither Petitioner nor Dr. Holland provided a specific name of a medical provider that trial counsel should have retained to testify. Additionally, Dr. Holland did not provide any evidence or testimony that would have changed the outcome of the trial. Petitioner has failed to comply with the requirements of *Abernathy*. Petitioner also failed to establish that there was a reasonable probability that but for trial counsel's decision not to retain an expert witness there was a reasonable probability that the results of Petitioner's trial would have been different. Finally, the Court finds that the testimony of Dr. Jay Holland was not credible.

Claim D.: Failing to call other lay witnesses.

In Petitioner's final claim, he asserts that trial counsel was ineffective for failing to present testimony by Thong Le, Hien Le, and Jacob Hooper. Petitioner asserts that Thong Le, who was Figueroa's boss at the chicken farm during the period of time in question, would have testified about the room in the chicken house where L.S. testified that the sexual activity between her and Figueroa took place. In her testimony, L.S. strongly implied that the area where Figueroa raped her (and specifically, the room itself in the chicken house) was a secluded, private area where there was no possibility that anyone would walk in on them during sex. Figueroa alleges that Thong Le, if called, would have rebutted this implication and testimony. As previously noted, whether to call a particular witness is a matter of trial strategy. Trial counsel testified at the hearing that Mr. Le "did not want to get involved." Thong Le did not testify at the Rule 37 hearing. Petitioner has failed to establish that testimony from Mr. Le would have led to a different result at his trial. The issue of whether the room was secluded was addressed in the cross-examination of L.S. and during Figueroa's testimony. Petitioner has not established that the same testimony offered by a different witness would have led the jury to reach a different conclusion.

Petitioner similarly alleges that Jacob Hooper, a supervisor at the chicken farm, would have corroborated Le's testimony by stating that he regularly came into the room where the rapes were committed. According to Petitioner, Hooper would have testified that if any sexual activity were taking place in that room, he most likely would have known about it because he most likely would have walked in on it.

Trial counsel testified at the hearing that he did not interview Jacob Hooper. Mr. Hooper testified at the Rule 37 hearing. Contrary to Petitioner's assertions, the

12

Court concludes that Mr. Hooper's testimony would not have been favorable to Figueroa. In fact, the testimony would have bolstered the claims against the Petitioner and could have been considered favorable to the State. Hooper testified that the rooms in the chicken houses were large enough for a sexual assault to occur in. He further testified that the rooms were remote enough for a sexual assault to occur in. Hooper noted that the assaults could occur without the knowledge of nearby individuals. Nothing contained in Mr. Hooper's testimony convinces this Court that a different outcome would have occurred at trial if he had been called as a witness. In fact, the Court concludes that such testimony only strengthens the arguments raised by the State. Thus, Petitioner has failed to satisfy the two-prongs of *Strickland*.

## Conclusion

For the foregoing reasons, the Court finds that Lazaro Veneros-Figueroa's has failed to establish that he is entitled to relief pursuant to Ark. R. Crim. P. Rule 37. Thus, Petitioner's request for post-conviction relief is hereby denied.

This appeal followed.

### III. *Standard of Review*

We do not reverse the denial of postconviction relief unless the circuit court's findings are clearly erroneous. *Conley v. State*, 2014 Ark. 172, 433 S.W.3d 234. A finding is clearly erroneous when, although there is evidence to support it, after reviewing the entire evidence, we are left with the definite and firm conviction that a mistake has been committed. *Id.* In making a determination on a claim of ineffective assistance of counsel, this court considers the totality of the evidence. *Id.*

Our standard of review also requires that we assess the effectiveness of counsel under the two-prong standard set forth by the Supreme Court of the United States in *Strickland v. Washington*, 466 U.S. 668 (1984). *Conley*, *supra*. In asserting ineffective assistance of counsel under *Strickland*, the petitioner must first demonstrate that counsel's performance was deficient. *Sartin v. State*, 2012 Ark. 155, 400 S.W.3d 694. This requires a showing that

counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the petitioner by the Sixth Amendment to the United States Constitution. *Woods v. State*, 2019 Ark. 62, 567 S.W.3d 494. In other words, the petitioner must show that his counsel's performance fell below an objective standard of reasonableness. *Mancia v. State*, 2015 Ark. 115, 459 S.W.3d 259. Additionally, counsel is allowed great leeway in making strategic and tactical decisions, particularly when deciding not to call a witness. *Johnson v. State*, 2018 Ark. 6, 534 S.W.3d 143. Matters of trial strategy and tactics, even if arguably improvident, fall within the realm of counsel's professional judgment and are not grounds for finding ineffective assistance of counsel. *Id.* A court must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Woods, supra.* The burden is on the petitioner to overcome this presumption and to identify specific acts and omissions by counsel that could not have been the result of reasoned professional judgment. *Sims v. State*, 2015 Ark. 363, 472 S.W.3d 107. Conclusory statements that counsel was ineffective cannot be the basis for postconviction relief. *Id.*

Second, the petitioner must show that the deficient performance prejudiced the defense, which requires a demonstration that counsel's errors were so serious as to deprive the petitioner of a fair trial. *Conley, supra.* This requires the petitioner to show that there is a reasonable probability that the fact-finder's decision would have been different absent counsel's errors. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. *Id.*

Unless a petitioner makes both *Strickland* showings, it cannot be said that the conviction resulted from a breakdown in the adversarial process that renders the result

14

unreliable. *Id.* We also recognize that "there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Anderson v. State*, 2011 Ark. 488, at 3–4, 385 S.W.3d 783, 787 (quoting *Strickland*, 466 U.S. at 697).

IV. *Failing to Challenge L.S.'s Competency*

Appellant first argues on appeal that the circuit court erred in denying his petition because his trial counsel was ineffective in failing to challenge L.S.'s competency. He argues that had trial counsel challenged L.S.'s competency, L.S. would have been barred from testifying. He argues that the outcome would have necessarily been different because "L.S.'s trial testimony was the only direct proof of 'Penetration' presented by the prosecution in this case." We disagree.

Mr. Monterrey testified that he did not challenge L.S.'s competency because he believed such a motion would have been frivolous and because, as a matter of trial strategy, he wanted the jury to hear L.S.'s "craziness." When a decision by trial counsel is a matter of trial tactics or strategy and that decision is supported by reasonable professional judgment, then such a decision is not a proper basis for relief under Rule 37. *Williams v. State*, 2017 Ark. 123, 517 S.W.3d 397 (per curiam). Moreover, failure to make a meritless objection or motion does not constitute ineffective assistance of counsel, and the onus is on the petitioner to show that counsel failed to raise a meritorious issue. *Maiden v. State*, 2019 Ark. 198, 575 S.W.3d 120; *England v. State*, 2018 Ark. App. 137, 543 S.W.3d 553.

The circuit court must begin with the presumption that every witness is competent to be a witness, and the party alleging that a witness is incompetent has the burden of

persuasion.  *Travis v. State*, 2015 Ark. App. 572, 474 S.W.3d 93; *Rouzer v. State*, 2009 Ark. App. 658.  The criteria for determining whether a witness is competent are (1) the ability to understand the obligation of an oath and to comprehend the obligation imposed by it; or (2) an understanding of the consequences of false swearing; or (3) the ability to receive accurate impressions and to retain them, to the extent that the capacity exists to transmit to the fact-finder a reasonable statement of what was seen, felt, or heard.  *Clem v. State*, 351 Ark. 112, 124, 90 S.W.3d 428, 434 (2002).  Competency, however, is not to be confused with reliability.  *Rouzer, supra.*  Instead, mere inconsistencies or hesitation in testimony may affect a witness's credibility but not the competency of a witness.  *Id.*  Finally, in determining the competency of a child witness, the circuit court will examine the child's testimony in its entirety and will not rely solely on preliminary questioning.  *Travis, supra.*  The fact that a child's testimony "may not have been a model of lucidity does not render [the witness] incompetent."  *Laughlin v. State*, 316 Ark. 489, 494, 872 S.W.2d 848, 851 (1994).

Here, appellant argues that L.S. was incompetent because she testified that she saw a "spirit" friend and had seen defense counsel in one of her nightmares.  However, L.S. testified that she knew that she was required to tell the truth or that she would be in trouble, and she testified in detail regarding what she saw, felt, and heard during the incidents of rape.  Therefore, she demonstrated that she had the ability to understand the obligation of an oath and comprehended the obligation imposed by it, understood the consequences of false swearing, and had the ability to transmit her impressions to the fact-finder in a reasonable statement of what she saw, felt, and heard.  *Clem, supra.*  Thus, because appellant

16

failed to prove trial counsel was deficient, we cannot say that the circuit court's denial of postconviction relief on this point was clearly erroneous and affirm.

V. *Calling Melanie Halbrook and Lorenza Sostenes*

Appellant next argues on appeal that the circuit court erred in denying his petition because his trial counsel was ineffective in presenting damaging testimony, specifically in calling Ms. Halbrook and Ms. Sostenes to testify. Appellant points to Mr. Monterrey's testimony acknowledging the damaging nature of their testimony. Despite the circuit court's findings that trial counsel's decisions to call Ms. Halbrook and Ms. Sostenes were a matter of trial strategy, appellant argues on appeal that we should nonetheless reverse because "[n]o reasonable attorney would have believed that testimony [of] either of these two would be the least bit helpful to the defense." Therefore, he argues that trial counsel's performance was deficient and that he was prejudiced because the witnesses' testimony only bolstered L.S.'s credibility.

The decision of trial counsel to call a witness is generally a matter of trial strategy and outside the purview of Rule 37.1, and trial counsel must use his or her best judgment to determine which witnesses will be beneficial to the defendant. *Johnson, supra.* Further, our supreme has held that the extent to which a witness is questioned is a matter of trial tactics and does not justify Rule 37 relief. *Lemaster v. State*, 2015 Ark. 167, 459 S.W.3d 802. Matters of trial strategy and tactics, even if arguably improvident, fall within the realm of counsel's professional judgment and are not grounds for finding ineffective assistance of counsel. *Williams, supra.*

17

Here, Mr. Monterrey testified that he had tactical purposes for calling Ms. Halbrook and Ms. Sostenes to testify. He called Ms. Halbrook to highlight inconsistencies in L.S.'s story because he noted that L.S.'s credibility was the critical issue at trial. Mr. Monterrey further testified that Ms. Sostenes had led him to believe that she would testify that she believed appellant instead of L.S. Unfortunately, she changed her story on the stand, which surprised Mr. Monterrey. Ms. Sostenes, however, did testify regarding L.S.'s history of constipation, the fact that L.S. claimed a spirit told her through her stuffed owl to start a fire in her bedroom, and the fact that L.S. previously accused another girl of touching her inappropriately. This testimony was a part of his overall defense strategy to provide an alternate explanation for the physical findings and to challenge L.S.'s credibility. We cannot conclude that the circuit court was clearly erroneous in determining that trial counsel's decision was one of reasonable trial strategy and that appellant therefore failed to satisfy his burden to prove trial counsel's performance was deficient under *Strickland*. Even if trial counsel's tactical choices had been different with the benefit of hindsight, the fact that the strategy was unsuccessful does not render counsel's assistance ineffective. *Williams*, *supra*. Accordingly, we affirm on this point.

VI. *Failing to Seek Out and Present Expert Medical Testimony*

Appellant next argues on appeal that the circuit court erred in denying his petition because his trial counsel was ineffective in failing to seek out and present expert medical testimony. Appellant specifically argues that his trial counsel should have sought and offered an expert witness like Dr. Holland to rebut Nurse Russette's damaging testimony. He argues that had an expert like Dr. Holland testified at trial, "there is a reasonable probability

18

that at least, [one] member of the jury would have harbored reasonable doubt in respect to guilt."

Appellant has failed to demonstrate that trial counsel's decision not to call a medical expert was ineffective assistance of counsel. There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, and the petitioner has the burden of overcoming that presumption by identifying the acts and omissions of counsel which, when viewed from counsel's perspective at the time of trial, could not have been the result of reasonable professional judgment. *Burnside v. State*, 2017 Ark. App. 691, 537 S.W.3d 796. Counsel's decision regarding the use of experts in a criminal trial is generally a matter of professional judgment. *Id*. Although Mr. Monterrey admitted at the evidentiary hearing that in hindsight he probably should have found a medical expert to testify because Nurse Russette's trial testimony went "above and beyond" her pretrial medical report, claims of ineffective assistance of counsel are not to be evaluated with the benefit of hindsight. Instead, we are to review claims of ineffective assistance of counsel "from counsel's perspective at the time of trial[.]" *Fletcher v. State*, 2015 Ark. 106, at 5, 458 S.W.3d 234, 239 (per curiam). Again, matters of trial strategy and tactics, even if arguably improvident, fall within the realm of counsel's professional judgment and are not grounds for a finding of ineffective assistance of counsel. *Burnside*, *supra*. Because the decision not to consult an expert was a matter of reasonable trial strategy, appellant has failed to satisfy his burden to show that trial counsel's decision was deficient under *Strickland*.

Moreover, appellant failed to demonstrate prejudice. As noted above, to prove prejudice, a petitioner is required to show that there is a reasonable probability that the fact-

finder's decision would have been different absent counsel's errors. *Conley*, *supra*. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. *Id*. Here, Nurse Russette testified that her exam revealed anal scarring that was consistent with L.S.'s story. She further refuted appellant's claim that the scarring could have resulted from constipation. According to appellant, an expert like Dr. Holland could have rebutted Nurse Russette's testimony and testified that the anal scarring could have been the result of constipation and could have called into question whether L.S.'s story was plausible without more severe trauma present. However, in *Burnside*, we held that proposed "hypothetical expert-swearing matches do not support a reasonable probability that a trial outcome would have been different or that counsel's professional judgment was unreasonable." *Burnside*, 2017 Ark. App. 691, at 8, 537 S.W.3d at 805. Accordingly, we affirm on this point and cannot say that the circuit court was clearly erroneous in denying appellant relief.

## VII. *Failing to Call Other Lay Witnesses*

Appellant finally argues on appeal that the circuit court erred in denying his petition because his trial counsel was ineffective in failing to call other lay witnesses. Specifically, appellant argues that trial counsel should have presented the testimony of Thong Le (also known as and referred to as Tom Lee at the evidentiary hearing), Hien Le, and Jacob Hooper. Appellant asserts that Thong Le could have testified that the chicken houses were not private and were instead "high traffic" areas. He further asserts that Mr. Hooper would have corroborated Mr. Le's testimony. Appellant does not establish who Hien Le is or the substance of Hien Le's testimony if called to the witness stand.

Again, the decision of trial counsel to call a witness is generally a matter of trial strategy and outside the purview of Rule 37.1. *Johnson*, *supra*. Trial counsel must use his or her best judgment to determine which witnesses will be beneficial to the defendant. *Id.* The objective in reviewing an assertion of ineffective assistance of counsel for failure to call certain witnesses is to determine whether that failure resulted in actual prejudice that denied the petitioner a fair trial. *Maiden v. State*, 2019 Ark. 198, 575 S.W.3d 120. When a petitioner alleges ineffective assistance of counsel for failure to interview or call a witness, it is incumbent on the petitioner to name the witness, provide a summary of the testimony, and establish that the testimony would have been admissible into evidence. *Gordon v. State*, 2018 Ark. 73, 539 S.W.3d 586. In order to demonstrate prejudice, the petitioner is required to establish that there was a reasonable probability that, had counsel performed further investigation and presented the witness, the outcome of the trial would have been different. *Maiden*, *supra*. When assessing counsel's decision not to call a particular witness, we must take into account that the decision is largely a matter of professional judgment, and the fact that there was a witness or witnesses who could have offered beneficial testimony is not, in itself, proof of counsel's ineffectiveness. *Id.*

We agree with the circuit court that appellant failed to meet this burden. Regarding Mr. Le, Mr. Monterrey testified that he made the strategic decision not to subpoena Mr. Le to testify because Mr. Le refused to testify in the first place. Additionally, Mr. Monterrey, contrary to appellant's testimony, testified that appellant did not provide him Mr. Hooper's name as a potential witness. The trier of fact is free to believe all or part of any witness's testimony and may resolve all questions of conflicting testimony and inconsistent evidence.

21

*Hoyle v. State*, 2011 Ark. 321, 388 S.W.3d 901. This court does not assess the credibility of the witnesses; conflicts in testimony are for the fact-finder to resolve, and the court is not required to believe the testimony of any witness, especially that of the accused, since he or she is the person most interested in the outcome of the proceedings. *Id.* Here, the circuit court was entitled to believe Mr. Monterrey's testimony that appellant did not provide him Mr. Hooper's name. Further, trial counsel was entitled to use his best judgment to determine which witnesses would be beneficial to the defendant. *Johnson*, *supra*. Moreover, although Mr. Hooper testified at the evidentiary hearing, we agree with the circuit court that Mr. Hooper's testimony could have been considered favorable to the State instead of the defense. Mr. Hooper testified that the rooms in the chicken houses are large and that no one could see inside the control room without entering the room. Given these facts, we cannot conclude that there was a reasonable probability that the outcome of appellant's trial would have been different. Because appellant failed to satisfy both prongs under *Strickland*, the circuit court's denial of relief on this point was not clearly erroneous.

Accordingly, we find no clear error in the circuit court's denying appellant Rule 37 relief and affirm.

Affirmed.

HARRISON, C.J., and BROWN, J., agree.

*Lazaro Veneros-Figueroa*, pro se appellant.

*Leslie Rutledge*, Att'y Gen., by: *Joseph Karl Luebke*, Ass't Att'y Gen., for appellee.